# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

|  |  |
|---|---|
| In re:<br><br>THOMAS CLYDE GIBSON,<br><br>Debtor | Chapter 7<br>Case No. 25-40419-EDK |
| JANET D. BECKLES,<br><br>Plaintiff<br><br>v.<br><br>THOMAS CLYDE GIBSON,<br><br>Defendant | Adversary Proceeding<br>No. 25-04022 |

## MEMORANDUM OF DECISION

Before the Court after trial is a complaint filed by Janet D. Beckles ("Beckles") against Thomas Clyde Gibson, the debtor in the underlying Chapter 7 bankruptcy case (the "Debtor") through which Beckles asks the Court to determine that certain debts owed by the Debtor are excepted from the Debtor's bankruptcy discharge. The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1), made applicable by Federal Rule of Bankruptcy Procedure 7052. The factual findings contained in this Memorandum are based on trial testimony, the admitted evidence, and the Court's own records. *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 196 F.3d 1, 8 (1st Cir. 1999).

1

Beckles and the Debtor met in 2020 while employed by the same employer and began a romantic relationship.  Over the course of their relationship, Beckles provided the Debtor with funds (either directly or through payments made or credit extended on the Debtor's behalf), which both parties agree were loans (and not gifts), but which were never fully repaid.  The relationship ultimately ended, Beckles sued the Debtor and received a default state-court judgment for the remaining amounts due (the "State Court Judgment"),[1] and the Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code")[2] with the goal, *inter alia*, of discharging his obligations to Beckles.  Beckles then commenced this adversary proceeding seeking a ruling that those obligations, as embodied in the State Court Judgment, are not dischargeable under the Bankruptcy Code.

There were a total of five obligations.  The first obligation was incurred in early 2021, when the Debtor asked Beckles for financial assistance in paying off a loan incurred by the Debtor in the purchase of a Yamaha motorcycle (the "Yamaha Loan Payoff"), and Beckles agreed.  On April 2, 2021, Beckles paid the outstanding balance of $8,563.61 on the loan.  According to Beckles, the Debtor promised to repay her for the Yamaha Loan Payoff and she relied on the Debtor's representation that the moneys would be repaid when she agreed to pay off the loan.  However, the parties never discussed the payment of interest, the amount of any periodic payments, or a due date for the repayment.

---

[1] While the State Court Judgment was not submitted into evidence, the Court took judicial notice of the State Court Judgment at the trial in this adversary proceeding held on May 7, 2026, as it was attached as Exhibit C to the complaint.  The State Court Judgment, issued by the Worcester County Superior Court, was entered on April 14, 2025 in the amount of $55,487.78.

[2] *See* 11 U.S.C. §§ 101 *et seq.*  All references to statutory provisions are to provisions of the Bankruptcy Code unless otherwise noted.

The Debtor did make some Venmo payments to Beckles related to the Yamaha Loan Payoff, but those payments were well short of the $8,563.61 that was advanced. Within the year, the Debtor sold the Yamaha motorcycle and received about $6,800.[3] Those proceeds were not used to repay Beckles. Instead, according to the Debtor, they were used to catch up on the Debtor's other bills. The Debtor says that he intended to repay Beckles for the Yamaha Loan Payoff, but that he fell on "hard times" and was unable to pay. Beckles says that the Debtor never intended to repay her those funds, as evidenced by his failure to use the proceeds of the sale of the Yamaha to reimburse her and (according to Beckles) by the Debtor's stated reason for ultimately breaking off the relationship – namely, that Beckles had essentially run out of money. Accordingly, Beckles argues, because the Debtor falsely represented an intent to repay when he had none, the debt for the Yamaha Loan Payoff should be excepted from the Debtor's discharge under § 523(a)(2)(A) as one obtained by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

In January 2022, the Debtor again approached Beckles with a request for funds to help with his finances. The Debtor did not specify the bills with which he needed assistance and Beckles says she did not ask. Nevertheless, Beckles provided the Debtor with a check for $20,000 (the "Personal Loan"). The memo line of the check for the Personal Loan indicates that it was a "gift," which Beckles says was added at the Debtor's insistence. Despite that notation, however, the Debtor testified that the Personal Loan was, indeed, a loan and that the Debtor intended to repay her. Beckles testified that she relied on the Debtor's promise to repay the Personal Loan, although specific repayment terms were not discussed. As with the Yamaha Loan Payoff, the Debtor made a couple of Venmo payments toward the Personal Loan, which Beckles estimated totaled $1,000,

---

[3] Neither party specified when the Yamaha was sold. Beckles testified that the Debtor sold it "immediately," and the Debtor said he could not recall when it was sold. However, the Debtor testified that the Yamaha had already been sold at the time of his later purchase of a Harley-Davidson motorcycle (which Beckles said occurred in July 2022).

but has not paid the remainder.  The Debtor again maintains that he intended to repay the Personal Loan but was simply unable to do so financially.  Beckles again maintains that the Debtor had no intention to repay the Personal Loan when he represented he would do so and, accordingly, that the Personal Loan should be excepted from the Debtor's discharge under § 523(a)(2)(A).

In April 2022, the Debtor approached Beckles for funds yet again; this time, according to Beckles, on the pretense that the Debtor's roommate had been involved in an accident that left the roommate's motorcycle in a state of disrepair.  Eager to return to riding with the roommate, the Debtor asked Beckles to advance funds for the repairs, which he said would be repaid when the roommate received insurance proceeds.  Beckles agreed and, on April 21, 2022, provided the Debtor with $3,800 to pay for the motorcycle repairs (the "Repair Loan").[4]  Beckles further credibly testified that the Debtor insisted that Beckles not discuss the Repair Loan with the roommate.

The Debtor disputes Beckles's version of those events, claiming that he never requested funds from Beckles to pay for his roommate's motorcycle repairs.  According to the Debtor, the roommate lived with him for only a short time (approximately 2 weeks) and the Debtor was unaware if or when the roommate was involved in an accident.  The Debtor acknowledged receipt of the funds, but he maintains that they were used to pay some of the Debtor's other obligations.  No portion of the Repair Loan was ever repaid.

Beckles was credible in her testimony, and the Court finds that the Debtor requested the funds from Beckles on the premise that his roommate's motorcycle was in need of repairs after an accident.  Having now disavowed that story, the Court also finds that the Debtor misrepresented

---

[4] Exhibit 3 reflects the multiple ATM withdrawals from Beckles's checking account comprising the Repair Loan.  While the total reflected as withdrawn slightly exceeds $3,800, a portion of the amounts shown as debited were for multiple ATM fees that were immediately credited back to the account.

4

to Beckles the use to which those funds would be put in order to obtain the Repair Loan.  Beckles contends that, based on those misrepresentations, the Repair Loan should be excepted from the Debtor's discharge pursuant to § 523(a)(2)(A).

In the middle of 2022, Beckles agreed to co-sign for a loan to assist the Debtor in obtaining financing to fund the purchase of a new motorcycle – this time a Harley-Davidson (the "Harley Loan").  While Beckles testified that she understood that, as a co-signer, she would also be responsible for the Harley Loan, she emphasized that she believed that the Debtor was the true "owner" of the vehicle and relied on his representation that he would be responsible for the monthly payments when she co-signed the loan.

In October 2022, Beckles paid off the Harley Loan in the approximate amount of $15,000 in anticipation of the parties' moving in together and at the Debtor's suggestion that they should pay off their outstanding obligations (the "Harley Loan Payoff").  Beckles says she believed the Debtor's representation that she would be repaid by the Debtor, although that repayment never happened.  While Beckles's argument regarding the Harley Loan Payoff is less clear, she asks that the obligation be determined nondischargeable under § 523(a)(2)(A), presumably on grounds that the Debtor promised to repay her the amount of the loan payoff without any intention of doing so and presumably again asking to the Court to consider that the Debtor ended the relationship because Beckles no longer had money or credit to offer him.

At some point prior to the end of the relationship in late 2022, the Debtor purchased a Jeep, with Beckles again co-signing for the loan for the vehicle.  According to the Debtor, he and Beckles visited a dealership together and later, after documents for the purchase and financing were completed, Beckles returned to the dealership (twice) on her own to sign the documents.  The Debtor went separately to the dealership to pay the down payment and to finalize the transaction.

5

The down payment, in the total amount of $5,500, was paid using Beckles's Citibank credit card (the "Down Payment"). The Debtor says that Beckles gave him the credit card and gave him permission to use the credit card to make the Down Payment. The Jeep was eventually surrendered and the Debtor never paid Beckles the $5,500 used for the Down Payment.

Beckles says that she did not provide the Debtor with her credit card and did not authorize the Debtor to use the credit card for the Down Payment. Beckles testified that, upon learning that the credit card had been used, she contacted the credit card company to inquire about the purchase and thereafter questioned the Debtor as to why the payment was made on her credit card. According to Beckles, the Debtor did not respond directly to that question, but insisted that he would pay her back. Beckles testified that she later disputed the transaction, but that the credit card company denied any requested relief due to the passage of time. More than four months after the end of their relationship, Beckles also filed a criminal complaint against the Debtor based on the use of the credit card.[5] However, a state court clerk-magistrate found "no probable cause on all criminal offenses and denie[d] criminal process." Ex. 4.

In weighing the evidence, the Court concludes that it is more likely than not that the use of the credit card was not an unauthorized use and that the Debtor had the express permission, or at least the acquiescence, of Beckles in using the Citibank card for the Down Payment. In reaching this conclusion, the Court relies on the fact that Beckles did not take immediate action to stop the credit card transaction, despite her testimony that she was contemporaneously alerted to the charge, and that she waited several months – after the end of the parties' relationship – to file a criminal complaint based on the alleged unauthorized use of the credit card.

---

[5] The amount of time between the alleged wrongful use of the credit card and the filing of the criminal complaint was likely even longer. It is unclear when, exactly, the Jeep was purchased, but it was clearly purchased (and the credit card used) prior to the end of the relationship, which Beckles testified was in the fall of 2022. Beckles filed the criminal complaint on April 11, 2023.

6

Beckles maintains that because the Debtor wrongfully used the credit card without her permission and caused her financial injury, that obligation should be excepted from the Debtor's discharge pursuant to § 523(a)(2)(A) and pursuant to § 523(a)(6) as a debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

Because Beckles has obtained a default judgment against the Debtor on account of the loans and transactions described above, the Debtor's obligation on those debts has been established. *See, e.g., Tague & Beem, P.C. v. Tague (In re Tague)*, 137 B.R. 495, 503 (Bankr. D. Colo. 1991) (state court judgment established debtor's liability on debt in nondischargeability action). Therefore, this Court's only role is to determine whether any of those obligations should be excepted from the Debtor's discharge.

Section 523(a)(2)(A) of the Bankruptcy Code excepts from a debtor's discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

> In order to establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, a creditor must establish each of the following elements by a preponderance of the evidence:
>
>> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*Zutrau v. Zutrau (In re Zutrau)*, 563 B.R. 431, 444 (B.A.P. 1st Cir. 2017) (quoting *Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 66 (1st Cir. 2012)). "The burden of proof and the burden of

production as to each element rests with the party contesting the dischargeability of a particular

debt under Bankruptcy Code § 523." *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997).

"The first element, making a knowingly false representation . . . can include a debtor's

promise to act, if, at the time the debtor made the promise, he had no intention of performing."

*Zutrau*, 563 B.R. at 444 (citing *Sega Auto Sales v. Flores (In re Flores)*, 535 B.R. 468, 482 (D.

Mass. 2015)). In other words,

> [i]f, at the time he made his promise, the debtor did not *intend to perform,* then he
> has made a false representation (false as to his intent) and the debt that arose as a
> result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).
> If he did so intend at the time he made his promise, but subsequently decided that
> he could not or would not so perform, then his initial representation was not false
> when made.

*Palmacci*, 121 F.3d at 787 (citations omitted).

The second element requires a showing that the debtor made the false statement with the

"intent to deceive, manipulate, or defraud." *Flores*, 535 B.R. at 482 (citing *Palmacci*, 121 F.3d at

786-87). "Although the inquiries are distinct, in many cases the same factors show both the

debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive."

*Id.* (citation omitted). And because "a debtor will rarely, if ever, admit to acting with an intent to

deceive, 'the court may infer fraudulent intent from the totality of the circumstances.'" *Zutrau*,

563 B.R. at 445 (quoting *R.C. Olsen Cadillac, Inc. v. Haras (In re Haras)*, 526 B.R. 435, 440

(Bankr. D. Mass. 2015)).

"[S]ince 'subsequent conduct may reflect back to the promisor's state of mind and thus

may be considered in ascertaining whether there was fraudulent intent' at the time the promise was

made, proper application of the 'totality' test . . . often warrants consideration of post-transaction

conduct and consequences, as well as pre-transaction conduct and contemporaneous events."

*Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996) (quoting *Krenowsky v. Haining (In re*

8

*Haining)*, 119 B.R. 460, 464 (Bankr. D. Del. 1990)). "However, a debtor's 'mere failure to perform is not sufficient evidence of scienter nor is subsequent conduct contrary to the original representation necessarily indicative of fraudulent intent.'" *deBenedictis v. Brady-Zell (In re Brady-Zell)*, 500 B.R. 295, 302 (B.A.P. 1st Cir. 2013) (quoting *Bellas Pavers, LLC v. Stewart (In re Stewart),* BAP No. MB 12–017, 2012 WL 5189048, at \*8 (B.A.P. 1st Cir. Oct. 18, 2012)), *aff'd*, 756 F.3d 69 (1st Cir. 2014).

With regard to the Yamaha Loan Payoff, the Personal Loan, and the Harley Loan Payoff, the Court finds and rules that Beckles failed to establish by a preponderance of the evidence that the Debtor made false promises to honor the repayment of those obligations at the time the obligations were incurred. The evidence regarding each of those obligations was rather thin, devolving mainly into a dispute between ex-romantic partners as to the internal state of mind of one of them.

As to the Yamaha Loan Payoff and the Personal Loan, Beckles admits that the Debtor made at least *some* payments towards those obligations, which, under a totality of the circumstances view, lends credence to the Debtor's assertion that he intended to repay Beckles at some point in the future. As to the failure to repay a portion of the Yamaha Loan Payoff from the proceeds of the sale of the Yamaha, the Court does not find that failure to be persuasive evidence of a lack of intent to repay Beckles at the time the obligation was incurred. Given the apparent nonexistence of any pressure on the Debtor to promptly repay the Yamaha Loan Payoff – i.e., the absence of any repayment terms or deadline for repayment – it is not surprising that the Debtor chose to use the proceeds to satisfy other obligations.

Similarly, although no payments were made to reimburse Beckles for the Harley Loan Payoff, there is also no evidence to suggest that the Debtor lacked the intention to repay at the time

9

he assured her he would.  Given the fact that no timeline for repayment was agreed to between the parties, and the fact that it appears the relationship ended relatively shortly after the Harley Loan was paid off, the Debtor's lack of effort to repay the obligation does not carry the day in establishing fraud at the time the obligation was incurred.  In sum, while it appears that the Debtor never made any serious, sustained efforts to repay Beckles for the Yamaha Loan Payoff, the Personal Loan, or Harley Loan Payoff, the Court cannot glean from that failure an actual misrepresentation by the Debtor or an intent to deceive at the time the obligations were incurred. Nor is the Court persuaded that the Debtor's comment about Beckles's finances at the end of their relationship constitutes sufficient evidence to demonstrate that the Debtor lacked an intent to repay Beckles at the time the obligations were originally incurred.  Without more, the Court cannot find that the statement made during a contentious moment in their relationship, vitriolic though it was, sufficiently establishes earlier fraudulent intent.[6]

"It is not at all uncommon for people to look back with regret on decisions they made when they were newly-in-love." *In re Holmes*, 570 B.R. 610, 620 (Bankr. W.D. Mo. 2017).  After the end of the relationship, the Court surmises that the Debtor likely regretted having become obligated to Beckles in such substantial sums and, at that point, either because of inability or unwillingness, decided to forego repayment of those obligations.  And it is undoubtedly true that Beckles, having

---

[6] In the complaint, Beckles alleged that the Debtor made a false statement by "[t]elling [Beckles] to write 'gift' in the memo line" for the Person Loan.  Other than Beckles's general allegation that the Debtor did not intend to repay Beckles despite representing that he would do so, no other specific arguments as to the import of the notation were advanced.  The Debtor was not specifically questioned regarding the allegations as to the notation and, in fact, testified at trial that Personal Loan was, in fact, a loan and not a gift.  The notation itself does not constitute a statement by the Debtor since, as acknowledged by Beckles, the Debtor did not write it.  And any other arguments not addressed here that Beckles may have intended to make based on that notation are waived. *See Casanova v. Wyndham Grand Rio Mar Beach Resort & Spa*, 205 F. Supp. 3d 220, 237 (D.P.R. 2016) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 16 (1st Cir. 2013) (internal citation omitted)).

10

been left with damaged credit and saddled by debts incurred to benefit an ex-partner, looks back with regret on having provided the Debtor with such substantial financial assistance. However, neither of those conclusions are sufficient to determine that the Debtor obtained the funds from Beckles through "false pretenses, a false representation, or actual fraud," as required by § 523(a)(2)(A). Accordingly, the debts for the Yamaha Loan Payoff, the Personal Loan, and the Harley Loan Payoff will not be excepted from the Debtor's discharge pursuant to § 523(a)(2)(A).

With regard to the Down Payment, because the Court has found that Beckles failed to demonstrate that the Debtor used her credit card without authorization, Beckles has accordingly failed to establish that obligation was incurred through the Debtor's "false pretenses, [] false representation, or actual fraud" by using the card without permission. 11 U.S.C. § 523(a)(2)(A). And, to the extent Beckles alternatively argues that the Debtor falsely represented an intent to repay the Down Payment at the time it was incurred, the Court also rules that Beckles failed to demonstrate that the Debtor made a knowingly false representation regarding his intent to repay.

As to the claim of nondischargeability under § 523(a)(6), the Court cannot find or rule that the Debtor acted willfully and maliciously in using the credit card within the meaning of § 523(a)(6). That section excepts from a debtor's discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In order to rule in Beckles's favor on that allegation, the Court must be able to find that the Debtor "intentionally act[ed] in a manner he kn[ew], or [wa]s substantially certain, will harm another," *O'Rorke v. Porcaro (In re Porcaro)*, 545 B.R. 384, 396 (B.A.P. 1st Cir. 2016) (quoting *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 19 (Bankr. D. Me. 1998)), and "that the injury was caused 'without just cause or excuse,'" *B.B. v. Bradley (In re Bradley),* 466 B.R. 582, 587 (B.A.P. 1st Cir. 2012) (quoting *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir. 1997)). Here, the

11

Debtor did not intentionally act in a manner that he knew, or was substantially certain, would cause harm to Beckles, or act without just cause or excuse, since the Debtor used the credit card with Beckles's permission or tacit authorization.  Accordingly, the liability of the Debtor on account of the Down Payment will not be excepted from the Debtor's discharge under § 523(a)(6).

Lastly, with regard to the Repair Loan, Beckles *has* established the elements required for that debt to be excepted from the Debtor's discharge by a preponderance of the evidence.  As indicated above, the Court finds that the Debtor misrepresented to Beckles that the moneys were needed for the repair of his roommate's motorcycle and that Beckles would be repaid when the roommate received insurance proceeds.  The Court also finds that the Debtor made that representation with the intent to deceive Beckles and to induce Beckles to provide the funds.  The Court credits Beckles's testimony that she relied on the Debtor's stated purpose for the funds in agreeing to lend the money.

Furthermore, the Court finds that Beckles's reliance on the Debtor's false statements was justifiable.  "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995) (quoting Restatement (Second) of Torts § 545A, cmt. b (A.L.I. 1976)).  "A party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation." *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 74 (1st Cir. 1998).  In determining whether justifiable reliance has been established, "the circumstances of the reliance claim must be taken into account and [] the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)." *Lentz v. Spadoni (In re Spadoni)*, 316 F.3d 56, 59 (1st Cir. 2003) (citing *Field*, 516 U.S. at 71).

Here, considering Beckles's knowledge of the Debtor's hobby of riding motorcycles with friends and the Debtor's seemingly legitimate reason for helping the roommate (i.e., the Debtor's desire for a riding partner to get back on the road), together with the representation that insurance proceeds would be forthcoming, the Court finds that the reliance was justifiable. And, clearly, the reliance on that false representation caused Beckles damage – she lost the funds, which were never repaid.

Accordingly, the Court finds and rules that the amount of $3,800, plus any fees, costs, and interest on account of the Repair Loan that are otherwise allowable under the State Court Judgment, *see Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998), will be excepted from the Debtor's discharge as having been obtained by false pretenses, a false representation, or actual fraud pursuant to § 523(a)(2)(A).

A separate judgment in conformity with this Memorandum will issue forthwith.


DATED: June 23, 2026                              By the Court,

                                                 _____
                                                 Elizabeth D. Katz
                                                 United States Bankruptcy Judge

13